UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BAMM PAUL OH, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:20-cv-237 (SRU) |
| | : | |
| APRN SAPRANO, et al., | : | |
| Defendants. | : | |

## INITIAL REVIEW ORDER

On February 20, 2020, the plaintiff, Bamm Paul Oh, a sentenced inmate who is currently confined at MacDougall-Walker Correctional Institution ("MacDougall"), filed this action against the Commissioner of the Department of Correction (the "DOC") and several DOC staff members employed at MacDougall, Corrigan-Radgowski Correctional Center ("Corrigan"), and Cheshire Correctional Institution ("Cheshire"). *See* Compl., Doc. No. 1.

Specifically, pursuant to 42 U.S.C. § 1983, Oh sues sixteen defendants: APRN Saprano, APRN Stork, Warden Kristene Barone, Deputy Warden David Snyder, Nurse Administrator O'Shea, Dr. John Doe, RN Supervisor Tawanna Furtick,[1] and RNs Gwen Hite, Tutu and Rose at MacDougall; Warden Kenneth Butricks, APRN Jean Caplin, and RN Supervisor Jones at Cheshire; RNs Julie and Stephanie Fraser[2] at Corrigan; and DOC Commissioner Rollin Cook[3] (collectively, the "Defendants"). Compl, Doc. No. 1, at 1–5. Oh alleges that he has received inadequate medical care while in prison; he seeks money damages and a preliminary injunction

---

[1] Oh refers to this RN as "Tuwana." *See* Compl., Doc. No. 1, at 1.
[2] Oh refers to this RN as "Stephine." *See* Compl., Doc. No. 1, at 1.
[3] As of July 1, 2020, Cook was no longer the Commissioner of the DOC. *See Connecticut prisons head Rollin Cook to resign July 1*, HARTFORD COURANT (June 12, 2020), https://www.courant.com/breaking-news/hc-br-doc-rollin-cook-resign-20200612-su5wkkx645hg5fht7yeu4pvnli-story.html.

ordering the DOC to provide him with appropriate treatment for his skin condition. *Id.* at 21; Mot. for Prelim. Inj., Doc No. 9, at 2–3.

I **dismiss without prejudice** Oh's complaint because it fails to state Eighth Amendment claims of deliberate indifference to Oh's need for medical treatment. I note that Oh filed this complaint *pro se*, but I have since appointed him *pro bono* counsel. *See* Order, Doc. No. 33. Because I dismiss the complaint without prejudice, Oh's appointed counsel may—if Oh's claims can be cured—file an amended complaint within thirty (30) days from the date of this Order.

## I.      Standard of Review

Under 28 U.S.C. § 1915A, I must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II.      Factual Background

2

In January 2019, Oh was housed at MacDougall, where he asked to be seen for a skin rash that covered 85 percent of his body.  *See* Compl., Doc. No. 1, at 7.  Although Oh wrote to sick call and filed grievances, Oh was not seen until April 11, 2019 by APRN Saprano.  *Id.* Saprano provided Oh with some skin creams and told him to see a dermatologist at UConn Health Center ("UConn").  *Id.*  Saprano also indicated that she would change Oh's pain medication to Neurontin because the current medication was hurting Oh's liver.  *Id.*

On April 23, 2019, Oh was transferred to Corrigan, where he wrote to RN Julie, who was responsible for arranging medical trips.  *Id.*  On April 29, 2019, Oh went to UConn, where he had a biopsy; the doctor said Oh's condition looked like psoriasis.[4]  *Id.*  In May 2019, Oh became sick from the Neurontin, and he was prescribed Ibuprofen.  *Id.* at 8.  Oh told RN Stephanie Fraser that he could not take Ibuprofen for long periods due to damage to his liver.  *Id.* Oh later saw RN Julie, who told him that, at UConn's instruction, Oh would begin a skin treatment with two topical creams for thirty days, and Oh would get a shot or a pill if the creams did not work.  *Id.*  RN Julie informed Oh that he needed to try the creams before taking the pills or getting the shot because the State of Connecticut would otherwise not cover the expensive pill or shot treatments.  *Id.*

Oh reports that he had difficulty with the cream treatment:  Oh quickly ran out of the creams because he had to apply the cream to a large portion of his body and the "creams were small."  *Id.*  After thirty days, Oh wrote to the medical unit to explain that the cream treatment did not work and that his pain was getting worse.  *Id.* at 9.  Oh indicated that he wanted to see the medical provider to discuss other treatment options and his pain issues.  *Id.*  After more than

---

[4]  Oh also indicates that a doctor at UConn diagnosed Oh with psoriatic arthritis.  *See* Compl., Doc. No. 1, at 17; Mot. for Prelim. Inj., Doc. No. 9, at 1.

ninety days and several requests, sick calls, and grievances, Oh asked RN Stephanie Fraser and

RN Julie to permit him to see the medical provider.  *Id.*  They told Oh that he was not a priority;

Oh was not seen by the medical provider while he was at Corrigan.  *Id.*

On August 21, 2019, Oh was transferred back to MacDougall, where he was seen on

August 26, 2019 by RN Tutu, who informed Oh that he would see APRN Stork.  *Id.*  Oh told RN

Tutu that he had experienced back spasms, numbness in his hands, and burning, peeling skin.  *Id.*

at 9–10.  RN Tutu responded that she would put him on the "emergency list" to see the medical

provider in September 2019.  *Id.* at 10.  After Oh's creams and Ibuprofen were discontinued, Oh

saw RN Tutu again.  *Id.*  At that time, RN Tutu informed Oh that she had done all she could for

him.  *Id.*  Oh continued to sign up for sick call.  *Id.*  When RN Gwen Hite saw Oh in September

and October 2019, Oh told RN Hite that his skin was getting worse and he was in pain.  *Id.*

Oh wrote to Nurse Supervisor Tawanna Furtick, APRN Stork, Nurse Administrator

O'Shea, Warden Kristene Barone, Deputy Warden David Snyder, and Commissioner Rollin

Cook; Oh explained that he needed to be seen by the medical provider for his skin and pain.  *Id.*

Oh talked to Warden Barone, Deputy Warden Snyder, and Commissioner Cook when they were

on tours of the prison facility to request medical attention.  *Id.*  Warden Barone and Deputy

Warden Snyder informed Oh that they "would talk to medical but the[y] did not control medical"

and that the medical administration was "at war" with the custody administration.  *Id.* at 10–11.

Nurse Administrator O'Shea said she would try to look into it.  *Id.*

Oh wrote to RN Supervisor Tawanna Furtick and wrote grievances to RN Rose.  Finally,

on November 10, 2019, RN Rose called Oh to the medical unit.  *Id.*  APRN Stork saw Oh on

November 13, 2019.  *Id.*  APRN Stork explained that Oh needed to go back to UConn and that,

due to the expense of the pill and shot treatments, the State of Connecticut would not permit her to provide Oh those treatments.  *Id.* at 11–12.  APRN Stork informed Oh that she would put Oh on vitamins because his lab results showed a deficiency in Vitamin D.  *Id.* at 12.  APRN Stork also put Oh on Lyrica for pain and ordered an EKG, lab tests, and x-rays of Oh's chest, knees, and back.  *Id.*  On November 24, 2019, Dr. John Doe assessed Oh's skin condition and placed him on steroids and Benadryl.  *Id.*  Dr. Doe informed Oh he need not go to UConn for his rash. *Id.*  APRN Stork raised Oh's Lyrica dosage and put Oh on Mobic (an anti-inflammatory drug) for Oh's muscles.  *Id.*

On December 5, 2019, Oh was transferred to Cheshire.  *Id.*  Oh was informed that the MacDougall administration did not want to deal with him anymore.  *Id.*  At Cheshire, Oh wrote to RN Supervisor Jones, who indicated that Oh would see APRN Jean Caplin.  *Id.*  Oh also wrote to Commissioner Cook and Warden Butricks about his medical issues.  *Id.* at 12–13.  After he told Warden Butricks about his pain, Warden Butricks stated that he would look into it.  *Id.*

On December 18, 2019, APRN Jean Caplin saw Oh.  *Id.* at 13.  She read Oh's x-ray and lab results and informed Oh that he has a deteriorating spine and prediabetes.  *Id.*  She also indicated that Oh's vitamins were unnecessary except for Vitamin D.  *Id.*  APRN Caplin told Oh that the pill and shot treatments for his skin condition were too expensive:  The State of Connecticut would not pay $3,000 to $5,000 for that treatment.  *Id.*  APRN Caplin discontinued Oh's vitamins and increased his Mobic dosage.  APRN Caplin informed Oh that he was a good candidate for the pill treatment and that Oh's skin disease could be a cause for most of his pain. *Id.*

5

APRN Caplin scheduled Oh for a trip to UConn, and she informed Oh that APRN Stork had not done so. *Id.* APRN Caplin also indicated that it would take between six and nine months to get a visit to UConn, and that she could not do anything further for Oh's skin or pain management until he was seen at UConn. *Id.* at 14. Oh asked both APRN Caplin and RN Supervisor Jones to do something for him, but they failed to provide Oh with any help for his condition. *Id.*

Oh has filed a petition for a writ of habeas corpus seeking relief in Connecticut Superior Court, but Oh remains in pain with burning, peeling skin. *Id.* at 14–16. The Defendants continue to delay and deny Oh treatment for his pain and skin condition. *Id.* at 16. UConn informed the DOC about Oh's psoriatic arthritis eleven months ago, but the Defendants have delayed Oh's treatment and stonewalled his requests. *Id.* at 17.

**III.    Discussion**

A.    Eighth Amendment Deliberate Indifference to Medical Needs

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (cleaned up). The Supreme Court has explained that such indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (cleaned up).

An official has exhibited deliberate indifference to an inmate's serious medical needs when that official knows that that inmate faces "'a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Harrison v. Barkley*, 219 F.3d 132,

6

137–38 (2d Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  To state a claim

for deliberate indifference, the plaintiff must satisfy both an objective and a subjective element.

Objectively, the plaintiff must allege that his medical need was serious; subjectively, the plaintiff

must allege that the defendants acted with a sufficiently culpable state of mind.  *See Smith v.*

*Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003).

       Objectively, the alleged deprivation must be "sufficiently serious."  *Wilson v. Seiter*, 501

U.S. 294, 298 (1991).  The condition must be "one that may produce death, degeneration, or

extreme pain."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (cleaned up).

Subjectively, the defendants must have been reckless—that is, they must have been actually

aware of a substantial risk that the plaintiff would suffer serious harm as a result of their conduct.

*See Salahuddin v. Goord*, 467 F.3d 263, 280–81 (2d Cir. 2006).  Thus, a defendant's mere

negligence is not cognizable on an Eighth Amendment deliberate indifference claim.  *See*

*Carpenter*, 316 F.3d at 184 (citing *Estelle*, 492 U.S. at 105–06).  Although "mere medical

malpractice is not tantamount to deliberate indifference," such medical malpractice may

constitute deliberate indifference when it "involves culpable recklessness, i.e., . . . a conscious

disregard of a substantial risk of serious harm."  *Chance v. Armstrong***,** 143 F.3d 698, 703 (2d

Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553) (cleaned up).  "[M]ere disagreement over [an

inmate's] proper treatment does not create a constitutional claim," and "[s]o long as the

treatment given is adequate, the fact that a prisoner might prefer a different treatment does not

give rise to an Eighth Amendment violation."  *Id.*

       When an inmate brings an Eighth Amendment deliberate indifference claim based on "a

temporary delay or interruption" of treatment, the court's objective, "serious medical need

inquiry can take into account the severity of the temporary deprivation alleged." *Carpenter,* 316 F.3d at 186.  The court should consider the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition." *Id.*  "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187.  Deliberate indifference claims based on a delay in treatment are difficult to establish:

> Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years . . . .  That [a plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.

*Demata v. New York State Corr. Dep't of Health Servs.*, 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (unpublished) (cleaned up); *see also Goolsby v. Cicconi-Crozier*, 2014 WL 1279066, at *4 (W.D.N.Y. Mar. 27, 2014) (citing *Demata*); *Henry v. Doe*, 2020 WL 209091, at *5 (S.D.N.Y. Jan. 10, 2020) (citing *Demata*).  To hold a particular defendant liable on such a theory, that defendant must have had the requisite state of mind to satisfy the subjective component of an inmate's Eighth Amendment claim:  The delay must have been "the result of intentional or reckless conduct on the part of" that defendant.  *Burke v. Pillai*, 2015 WL 1565413, at *7 (D. Conn. Apr. 8, 2015).

For purposes of this initial review, I conclude that Oh has a sufficiently serious condition to satisfy the objective component of the deliberate indifference analysis.  Oh alleges that his psoriasis and psoriatic arthritis cause him significant pain because they produce burning, peeling

skin and other harmful effects on his health and joints.  Oh's allegations suggest that he has experienced a delay in treatment that has caused his condition to worsen.  However, Oh's allegations do not indicate that any of the Defendants acted with a sufficiently culpable state of mind to be held liable for an Eighth Amendment violation.

1.  <u>Claims Against APRN Saprano, RN Rose, RN Hite, RN Tutu, RN Stephanie, and Dr. Doe.</u>

Oh has not stated an Eighth Amendment deliberate indifference claim against APRN Saprano, RN Rose, RN Hite, RN Tutu, RN Stephanie, and Dr. Doe.  That is because Oh's allegations do not plausibly indicate that those six defendants were reckless in treating Oh.  For instance, Oh's only allegations regarding APRN Saprano indicate that APRN Saprano provided Oh with skin creams, informed Oh that he should see a dermatologist at UConn, and changed Oh's pain medication to Neurontin due to potential liver damage.  *See* Compl., Doc. No. 1, at 7–8.  Those claims simply do not plausibly allege that APRN Saprano recklessly and deliberately ignored Oh's medical needs.  Instead, Oh's claims indicate that APRN Saprano responded to Oh's need for medical treatment.[5]  The analysis is the same for RN Rose.  Regarding RN Rose, Oh alleges only that Oh wrote grievances to her, after which RN Rose called Oh to the medical unit and arranged for Oh to see APRN Stork.  *See id.* at 11.  That is the sum total of Oh's allegations regarding RN Rose.  Similarly, Oh's only allegations regarding RN Hite are that Oh saw RN Hite in September and October 2019 and told RN Hite that his skin was getting worse.  *See id.* at 10.  Oh does not allege any particular action that RN Hite took or did not take in

---

[5]  Oh also alleges that he filed grievances and sent letters to sick call for four months until he was finally seen by APRN Saprano.  *See* Compl., Doc. No. 1, at 7.  However, Oh has not specified the individuals to whom he sent the letters or the individuals who reviewed his requests for treatment.  Thus, I cannot determine who, if anyone, acted with deliberate indifference to Oh's requests for medical treatment during the time preceding his meeting with APRN Saprano.

response to that information.  Viewed in the light most favorable to him, Oh alleges, at the most, that RN Rose and RN Hite acted negligently.

The same goes for Dr. Doe.  Oh claims that on November 24, 2019, Dr. Doe assessed Oh's skin condition, placed Oh on steroids and Benadryl, and informed Oh that he need not go to UConn.  *See id.* at 12.  Dr. Doe thus attempted to treat Oh's psoriasis.  That Oh might have preferred to go to UConn does not change the analysis because it is well settled that an inmate's unheeded preference for treatment does not create a constitutional claim.  *See, e.g.*, *Weatherwax v. Barone*, 2020 WL 1677069, at *3 (D. Conn. Apr. 6, 2020) (citing, *inter alia*, *Munoz v. Eliezer*, 2018 WL 1626170, at *6 n.5 (S.D.N.Y. Mar. 30, 2018)).

Likewise, Oh's allegations regarding RN Stephanie do not plausibly suggest that RN Stephanie acted recklessly.  Oh alleges that he told RN Stephanie that he could not take ibuprofen for long periods of time and that RN Stephanie once told Oh that he was not a medical priority and would not get "to see the p[ro]vider before others."  *See* Compl., Doc. No. 1, at 8–9.  Regarding the first allegation, Oh simply recounts something he told RN Stephanie.  There is no suggestion that RN Stephanie did not listen to him.  Regardless, even construed most liberally, Oh's complaint regards his psoriasis, not any damage that he suffered from taking ibuprofen.  Regarding Oh's second allegation, at the time Oh asked to see the medical provider at Corrigan, he had already been prescribed topical creams for his psoriasis.  *See id.*  Oh wanted to see the medical provider "to discuss the other treatment options plus pain issues I was having."  *Id.* at 9.  As already discussed, a prisoner's disagreement with a provider's chosen course of treatment alone does not raise a cognizable Eighth Amendment claim.  *See Chance*, 143 F.3d at 703.  Further, although Oh may have wished to see a medical provider immediately, he does not

plausibly allege that RN Stephanie was actually aware of a substantial risk that Oh would suffer serious harm as a result of her actions or inactions.  *See Salahuddin,* 467 F.3d at 280.

Finally, Oh's allegations against RN Tutu do not state a claim on which relief may be granted because, again, Oh has not plausibly alleged that RN Tutu acted with a sufficiently culpable state of mind.  Oh alleges that RN Tutu saw him on August 26, 2019.  Oh "explained [his] issues" to RN Tutu, who then referred Oh to APRN Stork.  *See* Compl., Doc. No. 1, at 9. Oh further told RN Tutu that he had experienced back spasms, numbness in his hands, and burning, peeling skin.  Thus, RN Tutu placed Oh on an "emergency list" to see the medical provider in September 2019.  Oh then vaguely alleges that he told RN Tutu that his skin creams and ibuprofen were discontinued.  *See id.* at 10.  At that time, Oh alleges that RN Tutu informed Oh that "she did all she could do."  *Id.*

Oh does not plausibly allege that RN Tutu acted recklessly.  Indeed, Oh admits that RN Tutu treated him by (1) referring him to APRN Stork and (2) putting him on an "emergency list" to be seen by a medical provider as soon as one week later.  Even though Oh alleges that RN Tutu eventually informed him that she "did all she could do," RN Tutu had already referred Oh to another nurse and placed him on an "emergency list" for treatment.  Even if RN Tutu should have followed up on Oh's requests to ensure that they proceeded apace, her failure to do so, at most, constituted negligence, which cannot support an Eighth Amendment deliberate indifference claim.  *See Burke*, 2015 WL 1565413, at *5 (citing *Carpenter*, 316 F.3d at 184; *Estelle*, 429 U.S. at 106).

For the foregoing reasons, I dismiss Oh's Eighth Amendment claims against APRN Saprano, RN Rose, RN Hite, RN Tutu, RN Stephanie, and Dr. Doe.

11

2.  <u>Claims Against Supervisory Defendants</u>

Oh sues seven supervisory defendants.  Three of those supervisory defendants apparently supervise nurses specifically:  Nurse Supervisor Tawanna Furtick, Nurse Administrator O'Shea, and RN Supervisor Jones.  Four of those supervisory defendants are prison-wide supervisors:  Warden Barone (MacDougall), Deputy Warden Snyder (MacDougall), Warden Butricks (Cheshire), and Commissioner Cook.  Oh's theory of liability is the same for all those defendants:  Although Oh brought his condition to their attention, they failed to help Oh, and so they exhibited deliberate indifference to Oh's serious medical needs in violation of the Eighth Amendment.  I dismiss all of Oh's claims against those seven supervisory defendants because (1) he has not alleged that some of them were personally involved in his alleged constitutional deprivation, and, even if he had, (2) he has not alleged that any supervisory defendant acted with a sufficiently culpable state of mind.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (cleaned up); *see also Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006).  Personal involvement of a supervisory defendant can arise through (1) participating directly in the violation; (2) failing to remedy the wrong after learning of it; (3) creating a policy or custom under which the violation occurred; (4) being grossly negligent in supervising the bad actor; or (5) exhibiting deliberate indifference to the plaintiff's rights by failing to act on information indicating that unconstitutional acts were occurring.  *Colon*, 58 F.3d at 873.[6]

---

[6]  The Second Circuit has observed that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]"  *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).  However, without further guidance, I assume for purposes of ruling on this motion that the categories outlined in *Colon* remain valid.

In my view, at least Nurse Supervisor Furtick and Commissioner Cook were not personally involved in any constitutional deprivation. "A supervisory official's mere receipt of a letter complaining about unconstitutional conduct is not enough to give rise to personal involvement on the part of the official." *Burke*, 2015 WL 1565413, at *6 (cleaned up); *see also Smart v. Goord*, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) (confirming that a supervisory defendant "cannot be held liable on the sole basis that he did not act in response to letters of protest"). In addition, "[t]o hold [high-ranking supervisory officials] liable on a mere complaint by an inmate, even a verbal one, would raise the same problems stemming from liability from letters" alone. *Hardy v. Illinois Dep't of Corr.*, 2017 WL 4224027, at *6 (S.D. Ill. Sept. 22, 2017). Oh's sole allegation against Nurse Supervisor Furtick is that Oh wrote to her regarding his allegedly unconstitutional medical treatment. *See* Compl., Doc. No. 1, at 10. Because Oh does not allege more, Oh has not alleged that Furtick was personally involved in any constitutional violation.

With respect to Commissioner Cook, Oh alleges that he wrote letters to Commissioner Cook, and, when Commissioner Cook was on a tour of Oh's prison facility, Oh verbally requested medical attention. *See* Compl., Doc. No. 1, at 10, 13. Even though Oh's complaints to Commissioner Cook included both letters and a verbal complaint, Oh still does not plausibly allege Commissioner Cook's personal involvement. A single inmate's verbal complaint to the Commissioner of the DOC during a prison facility tour is highly similar to an inmate's sending the Commissioner a letter. The only difference is that on the prison tour, the Commissioner can actually see the inmate. Thus, an inmate's verbal complaint might give rise to supervisory personal liability if, for instance, the complaining inmate was clearly in very serious, visible

13

danger at the time he made the complaint. *Cf. Hardy*, 2017 WL 4224027, at *6. But Oh does not make anything approaching such an allegation. Thus, Oh's single verbal complaint to Commissioner Cook during a prison facility tour was functionally equivalent to sending Commissioner Cook a letter. Further, I agree with other courts that have remarked that holding otherwise would "open up" a Commissioner "to deliberate indifference lawsuits based on inmates shouting complaints to the [Commissioner] during facility tours." *Id.* That would have a perverse effect on prison administration.

Oh's allegations against the five other supervisory defendants—Nurse Administrator O'Shea, RN Supervisor Jones, Warden Butricks, Deputy Warden Snyder, and Warden Barone—are highly similar to Oh's claims against Commissioner Cook. That is, Oh alleges that he wrote to all of them and talked to all of them (on prison tours or otherwise) regarding his condition, and each of those five defendants said they would look into it, but nothing happened. For that reason, I do not believe that Oh has plausibly alleged that any of those defendants was personally involved in any constitutional deprivation. However, even assuming that those five supervisory defendants *were* personally involved in Oh's alleged constitutional violation, I would still dismiss the claims against them because Oh does not plausibly allege that any acted with a sufficiently culpable state of mind.

With respect to Warden Butricks, Oh merely alleges that he wrote to Warden Butricks about his medical issues, and that, sometime thereafter, Warden Butricks stated that he would look into it. *See* Compl., Doc. No. 1, at 12–13. Without more, Oh's claims do not plausibly allege that Warden Butricks knew of "and disregard[ed] an excessive risk to" Oh's health or safety. *Hathaway*, 99 F.3d at 553. In other words, Oh has not plausibly alleged that Warden

14

Butricks acted recklessly.  Oh does not even allege, explicitly, that Warden Butricks failed to look into Oh's situation.  At worst, Oh's allegations may raise an inference that Warden Butricks acted negligently by failing to follow up on Oh's request when he said that he would.  But negligence is not enough to support an Eighth Amendment deliberate indifference claim.  *See Burke*, 2015 WL 1565413, at *5.

Oh's allegations regarding Deputy Warden Snyder and Warden Barone are nearly identical.  Oh alleges that he wrote to Snyder and Barone and explained that he needed to be seen by the medical provider for his skin and pain.  *See* Compl., Doc. No. 1, at 10.  Just as with Commissioner Cook, Oh alleges that he requested medical attention from Deputy Warden Snyder and Warden Barone while they were on a prison tour.  *See id.*  Oh's only additional allegation is that Warden Barone and Deputy Warden Snyder apparently responded to Oh's verbal complaints and said "they would talk to medical but the[y] did not control medical."  *Id.* Deputy Warden Snyder also responded that the medical administration was "at war" with the custody administration.  *Id.* at 11.  Even assuming that Oh sufficiently alleges Snyder and Barone's personal involvement in the alleged constitutional violation in this case, Oh does not plausibly allege that Snyder or Barone acted with a sufficiently culpable state of mind.  Notably, Oh does not allege that Barone and Snyder *did not* talk to medical.  Even assuming that they did not, their failure to do so would be, at most, negligent.  *Cf. Seymore v. Cherchever*, 2016 WL 3645197, at *8 (S.D.N.Y. June 29, 2016) (dismissing, at summary judgment, prisoner's Eighth Amendment claim against physician's assistant based on alleged failure to "look into" medical issue prisoner raised with physician's assistant).  In sum, Oh does not plausibly allege that Snyder or Barone were "actually aware of a substantial risk" that Oh would suffer serious harm

as a result of their conduct.  *Salahuddin*, 467 F.3d at 280–81.

The same goes for Nurse Administrator O'Shea and RN Supervisor Jones.  Regarding O'Shea, Oh alleges only that Oh wrote to O'Shea regarding his problems and, at some point, O'Shea "said she would try to look into it."  Compl., Doc. No. 1, at 11.  For the reasons already stated, even assuming that Oh plausibly alleges O'Shea's personal involvement, Oh does not plausibly allege that O'Shea acted recklessly.  Again, Oh notably does not allege that O'Shea failed to "look into" Oh's complaint.  Even assuming that she failed to do so, O'Shea's failure would be, at most, negligent.  *See Goolsby*, 2014 WL 1279066, at *2, *5 (dismissing in part, on initial review, prisoner's Eighth Amendment deliberate indifference claim when prisoner alleged that a "[n]urse told plaintiff that she would look into the issue" and "fail[ed] to get back to him").  Finally, regarding RN Supervisor Jones, Oh claims that he wrote to RN Supervisor Jones, who arranged for Oh to see APRN Jean Caplin; Oh also at some point asked RN Supervisor Jones for help, but, in Oh's view, Jones did not provide Oh help.  Oh's first allegation merely details that Jones helped Oh.  Oh's second allegation is vague and, for all the reasons identified above, does not plausibly allege that Jones acted recklessly.

3.  Claims Against APRN Stork, APRN Caplin, and RN Julie

Oh makes several allegations against these three nurses, including one common allegation.  I will first address the common allegation and then address the individual allegations.

a.  Denial of Oh's Requests for Pill or Shot Treatment

Oh alleges that each of APRN Stork, APRN Caplin, and RN Julie told Oh that they could not treat him by pills or shots, but only by cream, because the State of Connecticut would not cover the more expensive pill or shot treatment.  *See* Compl., Doc. No. 1, at 8 (RN Julie telling

16

Oh that he needed to try the creams before the pills or shots because the State of Connecticut would otherwise not cover the expensive pill or shot treatments); *id.* at 11–12 (APRN Stork explaining that, due to the expense of the pill and shot treatments, the State of Connecticut would not permit her to provide Oh those treatments); *id.* at 13 (APRN Caplin informing Oh that the State of Connecticut would not pay for the pill and shot treatments).  Oh summarizes:  "[T]his is a hor[r]ible and del[i]b[e]r[a]te act to save the State money, and they do not care that they have hurt me."  *Id.* at 15.  Oh does not plausibly allege that APRN Stork, APRN Caplin, or RN Julie acted recklessly.

Generally, an inmate's disagreement with a medical provider about his medical treatment is not sufficient to state an Eighth Amendment violation.  *See Chance*, 143 F.3d at 703; *Grays v. McGrain*, 333 F. Supp. 3d 225, 234 (W.D.N.Y. 2018) (citing cases).  However, a medical provider may be deliberately indifferent by consciously providing an inmate with "an easier and less efficacious" treatment plan, particularly if the provider does so because of ulterior motives, such as improper monetary incentives.  *Chance*, 143 F.3d at 703–04; *see also Braham v. Perelmuter*, 2017 WL 3222532, at *16–17 (D. Conn. July 28, 2017).  Put differently, a medical provider may be deliberately indifferent if the choice of treatment did not derive from sound medical judgment.  *See Chance*, 143 F.3d at 703–04.  "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case."  *Id.* at 703.

In *Braham*, for example, the district court denied the defendant-dentist's motion for summary judgment, in part, because a reasonable juror might have inferred that the defendant-dentist had chosen an unsound—but easier—treatment route by extracting several of the

plaintiff's teeth rather than by trying to restore them, despite the possibility that extraction could result in the plaintiff's losing more teeth. *Braham*, 2017 WL 3222532, at *17. Similarly, in *Chance*, the Second Circuit explained that the district court had erred in dismissing the plaintiff-prisoner's deliberate indifference claim based upon the defendant-dentists' decision to extract multiple of the plaintiff's teeth. *See Chase*, 143 F.3d at 700. That was because the plaintiff alleged that the defendant-dentists "would have been paid extra for the extractions." *See id.* Thus, if the plaintiff could prove that the defendant-dentists "recommended extraction not on the basis of their medical views, but because of monetary incentives," that "would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment." *Id.* at 704.

Although Oh's complaint reflects a difficult and frustrating effort to obtain effective medical treatment, his allegations do not suggest that APRN Stork, APRN Caplin, or RN Julie acted with conscious disregard of his medical needs. Unlike the dentist in *Braham,* Oh does not allege that any of those defendants chose an unsound—but easier—method of treatment. *See Braham*, 2017 WL 3222532, at *17. Oh also does not suggest that any of those defendants was motivated by ulterior considerations, such as improper monetary incentives, in providing Oh treatment. To be sure, Oh alleges that APRN Stork, APRN Caplin, and RN Julie told Oh that they were not authorized to provide Oh with treatment by pill or shot because the State of Connecticut had determined that such treatments were too expensive for state coverage. But those allegations do not suggest that any of those defendants was acting with an ulterior motive of financial gain. Unlike the defendants in *Chance*, APRN Stork, APRN Caplin, and RN Julie stood to gain (or lose) nothing personally from the type of treatment that Oh received. Thus,

18

Oh's claims based on those defendants' failure to provide him with different treatments that Oh

believes would have been more effective are dismissed without prejudice for failure to establish

the subjective element of the Eighth Amendment analysis.

       b.   Individual Allegations

Just like Oh's allegations against other defendants in this action, I dismiss Oh's more

specific allegations against APRN Stork, APRN Caplin, and RN Julie because none of those

allegations plausibly alleges that APRN Stork, APRN Caplin, or RN Julie were "actually aware

of a substantial risk" that Oh would suffer serious harm as a result of their conduct.  *Salahuddin*,

467 F.3d at 280–81.  In fact, almost all of Oh's allegations against APRN Stork, APRN Caplin,

and RN Julie detail the ways in which those defendants helped Oh.

Oh alleges that APRN Stork put Oh on vitamins because his lab results showed a

deficiency in Vitamin D.  *See* Compl., Doc. No. 1, at 12.  Oh alleges that some of the vitamins

that APRN Stork told him to take were unnecessary.  *See id.*  Oh also alleges that APRN Stork

put Oh on Lyrica for pain and ordered an EKG, lab tests, and x-rays of Oh's chest, knees, and

back.  *See id.*  At a later date, APRN Stork raised Oh's Lyrica dosage and put Oh on Mobic (an

anti-inflammatory drug) for his muscles.  *See id.*  Oh also claims that APRN Stork did not

arrange for him to return to UConn.  *See id.* at 13.  The above allegations demonstrate that

APRN Stork attempted to help and treat Oh.  Oh's belief that he did not need the vitamins that

APRN Stork told him to take is a simple disagreement about a course of treatment with a

medical provider, which is not cognizable on an Eighth Amendment claim of deliberate

indifference.  Furthermore, Oh's allegation that APRN Stork failed to put him back on the list of

patients to go to UConn does not plausibly allege that APRN Stork was anything more than

negligent (particularly given her other efforts to treat Oh), which is not cognizable on an Eighth

Amendment claim.  See *Farmer*, 511 U.S. at 835.

Oh alleges that APRN Caplin saw Oh, read Oh's x-ray and lab results, and informed Oh

that he had a deteriorating spine and prediabetes.  *See* Compl., Doc. No. 1, at 13.  Oh also alleges

that APRN Caplin indicated that Oh's vitamins were unnecessary except for Vitamin D, so she

discontinued Oh's vitamins and increased his Mobic dosage.  *See id.*  APRN Caplin informed Oh

that he was a good candidate for the pill treatment and that Oh's skin disease could be a cause for

most of his pain.  *See id.*  APRN Caplin scheduled Oh for a trip to UConn but indicated that it

would take between six and nine months to actually visit and that she could not do anything

further for Oh's skin or pain management until he was seen at UConn.  *See id.* at 14.  Oh asked

both APRN Caplin and RN Supervisor Jones to do something for him, but they failed to provide

Oh with any help for his condition.  *See id.*

None of Oh's claims regarding APRN Caplin plausibly alleges that APRN Caplin was

recklessly indifferent to Oh's medical needs.  Again, most of Oh's claims detail APRN Caplin's

efforts to help Oh.  To the extent Oh complains that APRN Caplin could not speed up his visit to

UConn, Oh does not plausibly allege that APRN Caplin was in any way responsible for that

delay.  To the extent Oh complains that he asked APRN Caplin to "do something" and that

APRN Caplin did not, I have already explained why the same allegation against RN Supervisor

Jones is vague and does not plausibly allege that APRN Caplin acted recklessly.

Finally, Oh's only individual allegation against RN Julie is one that he also makes against

RN Stephanie Fraser:  that when Oh asked RN Stephanie Fraser and RN Julie to permit him to

see the medical provider, they told Oh that he was not a priority.  *See* Compl., Doc. No. 1, at 9.  I

20

have already explained why that allegation does not plausibly allege that RN Julie was actually aware of a substantial risk that Oh would suffer serious harm as a result of her actions or inactions. *See Salahuddin,* 467 F.3d at 280.

    4. Official Capacity Claims

Because I have concluded that Oh's complaint fails to state plausible Eighth Amendment deliberate indifference claims against all of the Defendants, I also dismiss Oh's official capacity claims for a preliminary injunction against the Defendants. *See* Compl., Doc. No. 1, at 21 (requesting "treatment and medical to treat my is[s]ues"); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010) (requests for injunctive relief are remedies and are dismissed with the underlying claim).

**ORDERS**

    For the foregoing reasons, I **dismiss without prejudice** Oh's complaint in its entirety because his Eighth Amendment claims are not plausible and thus "fail[] to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b)(1). Oh's appointed *pro bono* counsel may file an amended complaint within thirty (30) days of this ruling. If no amended complaint is filed within thirty (30) days of this ruling, the Clerk is instructed to close the case.

    Because I have dismissed Oh's complaint in its entirety, I also **deny without prejudice** Oh's pending motions related to the claims contained in his complaint:

-    Motion for Preliminary Injunction, **Doc. No. 9**;

-    Motion for Oral Argument, **Doc. No. 13**;

-    Motion to Collect Evidence, **Doc. No. 14**;

-    Motion to Add Supporting Conduct, **Doc. No. 15**;

- Motion for Disclosure, **Doc. No. 16**;

- Motion to Subpoena Medical Records, **Doc. No. 20**;

- Letter Motion to Inform the Court, **Doc. No. 22**;

- Motion for Damages Analysis, **Doc. No. 25**;

- Motion to Add to Complaint, **Doc. No. 26**;

- Motion to Clarify and Respond, **Doc. No. 29**;

- Motion for Emergency Medical Treatment and Care, **Doc. No. 37**; and

- Motion for Settlement Conference, **Doc. No. 38**.

Oh's Motion to Appoint Counsel, **doc. no. 4**, is **denied as moot** because I have already appointed *pro bono* counsel in this matter. *See* Order, Doc. No. 33. Oh's motions to strike, **doc. nos. 24 and 27**, relate to the defendants' objection to Oh's motion for release; thus, Oh's motions to strike are **denied as moot** because I have already denied without prejudice Oh's motion for release from custody. *See* Order, Doc. No. 36. However, I **grant** Oh's Motion for Clarification, **doc. no. 35**, regarding the role of his appointed *pro bono* counsel. I advise Oh that Attorney Michael J. Dugan has been appointed to represent Oh in all matters of this case. Oh's counsel is instructed to file an amended complaint within thirty (30) days if Oh can allege any plausible Eighth Amendment claims. **All filings and communications with the court must be submitted by counsel, rather than by Oh**.

Finally, I **deny as moot** the Defendants' motion to stay, **doc. no. 23**, because I have now dismissed without prejudice Oh's complaint.


It is so ordered.

22

Dated at Bridgeport, Connecticut this 27th day of July 2020.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge